UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Orlando Division


CONNLEY DAVIDSON,

       Plaintiff,

v.                                    Case No. 6:06-cv-1674-Orl-19KRS

ORANGE LAKE COUNTRY CLUB,
INC., a Florida corporation, and
ORANGE LAKE COUNTRY CLUB
REALTY, INC., a Florida corporation,

       Defendants.

_____/

**DEFENDANT ORANGE LAKE COUNTRY CLUB, INC.'S FULLY-DISPOSITIVE MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

       Defendant Orange Lake Country Club, Inc. ("OLCC") moves for summary judgment in its favor against Plaintiff Connley Davidson, because OLCC was never Plaintiff's employer pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.  Alternatively, if OLCC is held to have been Plaintiff's employer, Plaintiff was exempt from overtime pay according to the FLSA's commissioned salesman exemption, 29 U.S.C. § 207(i).

**I.      MOTION FOR SUMMARY JUDGMENT**

       Plaintiff Connley Davidson alleges in his Amended Complaint that he was employed by both Orange Lake Country Club Realty, Inc. ("Realty") and OLCC, and therefore that OLCC is jointly liable for the alleged failed to pay Plaintiff overtime due for hours worked in excess of forty hours in a workweek, in violation of the Fair Labor Standards Act ("FLSA").  *See* DE 14

¶¶ 4, 11.  Because OLCC was not Plaintiff's "employer" for purposes of the FLSA during the time period at issue in this action, summary judgment should be granted for OLCC and against Plaintiff in this case.  In the alternative, if the Court should somehow find that Plaintiff was employed by OLCC, Plaintiff's overtime claim would still fail, as OLCC is a "retail or service establishment" and the requirements for application of the FLSA's section 7(i) exemption from overtime requirements are otherwise met.  In consequence, summary judgment should be granted for OLCC even in the event the Court should find OLCC to have been Plaintiff's employer during the period at issue in this case.  The facts and law in support of OLCC's motion are set forth in more detail below.

II.     **STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

A.     **Pertinent Procedural Background**.

1.     OLCC initially moved to dismiss this action for lack of subject matter jurisdiction, on the ground that OLCC was at no time Davidson's employer pursuant to the FLSA and therefore the Court lacked jurisdiction over Plaintiff's FLSA action against OLCC.  *See* DE 12.  Davidson then filed an amended complaint adding Realty as a second defendant and asserting that OLCC and Realty jointly employed Davidson.  *See* DE 14 ¶ 4.  The Court subsequently denied OLCC's motion to dismiss, finding that the Court had subject matter jurisdiction as a result of the addition of Realty as a defendant and that OLCC's "employer" status was more properly decided on a Motion for Summary Judgment.  *See* DE 30 p. 2.

2.     After an offer of judgment was extended to Davidson pursuant to Fed. R. Civ. P. 68, Defendants moved to dismiss this action because (1) Plaintiff's overtime claim was rendered

moot by the offer of judgment, and (2) Plaintiff could not satisfy his burden of demonstrating that he worked overtime hours that were more than *de minimis* for which he was not properly compensated. *See* DE 37. The Court denied the motion, finding that there were disputes of fact as to whether the offer of judgment provided Plaintiff with full relief, and as to whether Plaintiff worked more than *de minimis* overtime during his employment. *See* DE 47 pp. 5-6.

3.     Consistent with the Court's earlier ruling on its Motion to Dismiss, OLCC now moves for summary judgment on the ground that it was at no time pertinent Plaintiff's employer, and because if OLCC was Plaintiff's employer, Plaintiff was exempt from overtime by the commissioned salesman exemption, FLSA section 7(i).

**B.     The undisputed material facts showing OLCC was never Plaintiff's employer.**

4.     Connley Davidson was employed by Realty from January of 2005 to September of 2006 as a sales consultant. During that period he was directly supervised by Realty's sales managers, who were employed by Realty, and indirectly by the sales directors, including Bob Sanchez, who were also employed by Realty. DE 64 Ex. C (Declaration of John Sutherland) ¶ 3.

5.     Davidson was never employed by OLCC. DE 12 Ex. 1 (Declaration of Daniel L. Carricato) ¶ 4.

6.     During the period Davidson was employed by Realty, John Sutherland was a vice president of Realty, Bob Albertson or his predecessor Mike Stopperich was senior vice president of Realty, and Don Harrill or his predecessor Charles Swan was president and CEO of Realty. DE 64 Ex A (Declaration of Christina Briggs) ¶ 4 & Att. A.

7.    The audited consolidated financial statements for OLCC and its subsidiaries as of December 31, 2006 and 2005, covering the period of time that Plaintiff was employed by Realty, do not include Realty.  Nor is Realty reflected in those consolidated financial statements as a subsidiary, affiliate, or related party of OLCC.  DE 64 Ex B (Declaration of Thomas Nelson) ¶ 4.

8.    Realty was specifically excluded from consolidation in OLCC's financial statements because it was determined by OLCC's independent outside auditors that OLCC did not meet the criteria for control over Realty set forth in Financial Accounting Standards Board Interpretation ("FIN") 46 on consolidation of variable interest entities.  DE 64 Ex B ¶ 5.

9.    During Plaintiff's employment, final decisions about the rate and method of compensation of sales consultants such as Plaintiff, and about the terms and conditions of employment of those sales consultants, were principally made by John Sutherland in his position as vice president of Realty, but on occasion were made by Bob Albertson as senior vice president of Realty (or his predecessor), and/or by Don Harrill as president and CEO of Realty (or his predecessor).  DE 64 Ex. C ¶ 4.

10.    Day-to-day decisions such as the number of sales consultants needed on a given day, when to "cut the line" and release sales consultants for the day, which sales consultants should be assigned to tours, and whether a sales consultant should be disciplined or terminated, were made by the sales managers of Realty with input from the sales directors.  Realty vice president John Sutherland reviewed discipline and termination decisions in his role as vice president of Realty.  DE 64 Ex C ¶ 5, Ex E 58 l. 8-14.

-4-

11.     OLCC did not exercise any control whatsoever over the work of Realty's sales consultants.  The authority to hire, terminate, discipline, reassign, and determine the hours and terms of the work of sales consultants during Davidson's employment with Realty at all times rested with Realty's officers and managers.  DE 64 Ex C ¶ 6.

12.     OLCC also did not exercise any oversight or supervision, direct or indirect, of the work of Realty's sales consultants during the period of Plaintiff's employment.  The sales managers and sales directors employed by Realty supervised the sales consultants' work and had sole managerial control over the sales consultants during the period of Davidson's employment. The officers of Realty had indirect oversight or supervision.  DE 64 Ex C ¶ 7.

13.     Realty's managers and officers had the right to hire, fire, or modify the employment conditions of Realty's sales consultants, including Plaintiff, during the period of Davidson's employment.  To the extent Bob Albertson or his predecessor, Don Harrill or his predecessor, or John Sutherland got involved in or reviewed hiring decisions or problems involving Realty employees, each did so due to his position as an officer of Realty.  DE 64 Ex C ¶ 8.

14.     OLCC did not determine the rate or method of pay of Davidson.  The power to determine the rates and methods of compensation for Realty employees, including sales consultants, during Davidson's employment with Realty rested with Realty's officers. Such determinations were made by Realty with the guidance and consultation from human resources services provided to Realty by Wilson Resort Management Corp. ("WRMC").   DE 64 Ex C ¶ 10.

15.     WRMC was retained to provide specific management and support services to certain entities at Orange Lake Resort & Country Club, including Realty, during the time period at issue in this action. In addition to human resources, the management support services that WRMC was retained to provide to Realty included accounting and finance, technology, and payroll.  These services were provided to Realty by WRMC and not by OLCC.  DE 64 Ex B ¶ 3.

16.     Human Resources support services were provided to Realty from time to time by WRMC regarding various employment matters during Plaintiff's employment.  However Human Resources only served as a consultant, providing guidance on employment policies and practices for Realty employees and on how to discipline or terminate Realty employees.   Human Resources personnel from WRMC did not make the final decisions regarding employment matters for Realty.  DE 64 Ex C ¶ 9.

17.     WRMC was responsible for providing payroll services, including preparation of payroll and payment of wages, and for providing guidance on the rates and methods of compensation for Realty employees, but WRMC did not actually set the pay rates or determine the method of payment for Realty employees.  Those decisions regarding Realty employees were made by the management and officers of Realty during the period Davidson was employed by Realty. OLCC had no role in such determinations.  DE 64 Ex C ¶ 10.

18.     Training for Realty employees, including the sales consultants, during Plaintiff's employment with Realty was provided primarily by trainers employed by Realty.  Some guidance

and support on training matters was provided by WRMC through its human resources personnel.

No training was provided by OLCC.  DE 64 Ex C ¶ 16.

**C.      <u>The undisputed material facts showing OLCC is a retail or service establishment</u>**.

19.     The product sold by OLCC principally consisted of timeshare interest accommodations for a set interval of time --  typically one week – in one of the four separate condominium communities located at the resort, along with the right to use certain recreational and entertainment amenities integral to the vacation experience at the resort such as swimming pools, tennis courts, and movie theater.   Since June of 2006 the product has included membership in the GlobalAccess Exchange Program, a exchange program owned and operated by GlobalAccess Exchange, LLC which provides vacation exchange services and other travel and entertainment products.  DE 64 Ex D ¶ 7.  The product sold is a vacation product.  DE 64 Ex D ¶ 12.

20.     The swimming pools, tennis courts, movie theatre, and other recreational and entertainment facilities are available to accommodation owners or lessees or overnight guests of the resort that have rights to use these amenities as part of their ownership or vacation package purchased.  In addition, the golf courses, retail shops, bars and restaurants are open to the public in addition to accommodation owners, lessees or overnight guests, for the purchase of goods or services.  DE 64 Ex D ¶ 8.

21.     Excluding proceeds from financing and interest income when calculating the annual dollar volume of goods and services sold by OLCC, more than 75 per cent of the annual dollar volume of sales of goods or services sold by OLCC in 2005 and 2006 was retail, meaning

not purchased for the purpose of resale and not sold for use or incorporation into another product to be sold.  Such goods and services include ticket sales, food and beverage sales, retail store revenues, and golf and miniature golf revenues, but also include the sale of timeshare interests. DE 64 Ex D ¶ 10.

22.     The customer who purchases the timeshare interest is the intended consumer of that interest or of a vacation benefit acquired with the points credited by exchange of the timeshare interest purchased.  DE 64 Ex D ¶ 11.

23.     The resort accommodations are licensed by the state of Florida under Chapter 509, Florida Statutes, as public lodging establishments.  DE 64 Ex D ¶ 12.

**D.       The undisputed facts regarding Davidson's compensation**.

24.     During Plaintiff's employment with Realty, sales consultants were compensated through commissions earned on time share products they sold, with minimum earnings of $455 per week.  DE 64 Ex C ¶ 15.

25.     The time share vacation packages sold by the sales consultants are big-ticket items, and some sales consultants -- including Plaintiff himself -- made over $150,000 on an annual basis during the period of Plaintiff's employment. DE 64 Ex C ¶ 15.

26.     Plaintiff's gross earnings were $101,167 from Realty in 2005, and $151,161 from Realty from January through September, 2006.  DE 64 Ex F.

27.     Plaintiff worked a total of 88 weeks for Realty.  DE 25.  For the vast majority of those weeks Plaintiff earned well over $455, the minimum paid each week by Realty.  *See* DE 25.

-8-

28.     Prior to bringing this action, Plaintiff was hired by Starwood Sheraton Vistana in Orlando as a timeshare sales agent to perform the same job he performed at Orange Lake. Since the start of his employment at Starwood Vistana Resort, Plaintiff has been paid entirely based on commission and not on an hourly basis.  DE 64 Ex G.  Plaintiff has not asserted any claim against Sheraton Vistana for overtime compensation.

## III.     MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

Pursuant to the FLSA, 29 U.S.C. § 207(a), an employer may not employ an employee for more than forty hours in a workweek unless the employee receives one and one half his or her regular rate of pay for each hour worked in excess of forty in the workweek – unless an exception or exemption to the overtime requirements applies.  29 U.S.C. § 216(b) in turn provides that an "employer" who violates Section 207 shall be liable to the employee affected in the amount of his or her unpaid overtime compensation.  Because OLCC was not an "employer" of Plaintiff for purposes of the FLSA, or alternatively because an exception to the overtime requirements applies if OLCC is deemed Plaintiff's "employer", summary judgment should be granted to OLCC in this case.

## A.     OLCC was not a "joint employer" of Plaintiff.

Plaintiff has alleged in his amended complaint that OLCC jointly employed Plaintiff during the time period that Plaintiff was employed by Realty.  Plaintiff agrees that the applicable legal test for "joint employer" status has been set forth in established and binding precedent in this Circuit in the case of  *Aimable v. Long & Scott Farms*, 20 F.3d 434, 440 (11th Cir.), *cert. denied*, 513 U.S. 943 (1994), and reinforced in subsequent 11th Circuit decisions. *See* DE 15

(Plaintiff's opposition to OLCC's motion to dismiss) at p. 4 (citing applicable 11th Circuit authority on "joint employer" status).  According to this Eleventh Circuit jurisprudence, to determine whether a joint employment relationship exists under the FLSA a court is to consider the following factors:

    (1)      the nature and degree of the putative employer's control of the workers;

    (2)      the degree of supervision, direct or indirect, of the work;

    (3)      the right, directly or indirectly, to hire, fire, or modify the workers' employment conditions;

    (4)      the power to determine the workers' pay rates or methods of payment; and

    (5)      the preparation of payroll and payment of workers' wages.

*See Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir. 1996) (citing *Aimable*, 20 F.3d at 440-45); *see also* DE 15 p. 4.[1/] As Plaintiff has stated in his previous filing in this case, "[i]n making a determination [of joint employer status] Courts must evaluate the economic realities of the individual case rather than rely upon traditional common law principles.  *See Antenor*, 88 F.3d at 933.  The focus of the economic realities test is whether the plaintiff was dependent upon the putative employer.  *Id.* at 932."  DE 15 p. 3.  Applying the factors set forth by the Eleventh

---

[1/]Although Plaintiff cites three additional factors as part of the "joint employer" test in his opposition to OLCC's motion to dismiss previously filed by Plaintiff in this case – ownership of the facilities where the work occurred, whether the worker performed a line job integral to the end product, and the relative investment in equipment and facilities – according to the Eleventh Circuit these three factors are only relevant when determining whether employees are independent contractors, and not when determining whether they are joint employees.  *See Antenor*, 88 F.3d at 932, n.9.  In consequence, the joint employer status of OLCC turns solely on the five factors recited above.

Circuit to the facts of this case, evaluated from the perspective of the economic realities of Plaintiff's situation, OLCC may not be held to constitute Plaintiff's joint employer.

### 1.      Actual control of workers at issue

As to degree of control, the focus is on the actual working relationship, and the undisputed facts set forth above show that OLCC exercised no control over Realty employees in practice during the period of Plaintiff's employment with OLCC. More specifically, in *Antenor* the Eleventh Circuit stated with respect to this first "joint employer" factor that "[s]uch control arises when [the alleged employer] determines for example, the number of workers hired for a job, when work should begin on a particular day, which workers should be assigned to specific tasks and whether a worker should be disciplined or retained." *Id.* at 933. There is no evidence that OLCC determined any such matters with respect to Realty's employees, including Plaintiff.

That OLCC has no actual control over Realty is reinforced by the fact that Realty is not a "related party" identified in OLCC's audited financial statements, because Realty does not have an equity relationship with OLCC and the two entities are not affiliates. Moreover, Realty was specifically excluded from consolidation with OLCC in financial statements during the period Plaintiff was employed because did Realty also did not meet the criteria for consolidation based on interests other than equity interests, as set forth in Financial Accounting Standards Board Interpretation ("FIN") 46 on consolidation of variable interest entities. (The Court may take judicial notice of FASB's FIN 46 provisions, set forth on the FASB.org website.) Because

-11-

OLCC had no actual control over Realty or over the work of Realty's employees, this first factor weighs against any finding of joint employer status for OLCC.

### 2.      Degree of supervision of Plaintiff's work

As to the second factor, OLCC's degree of oversight or supervision of the work of Realty's employees, OLCC exercised no oversight or supervision whatsoever over Realty's employees during the period Plaintiff was employed, as demonstrated by the undisputed facts and supporting evidence of those facts cited above.  Instead the record evidence establishes that managers employed by Realty supervised Plaintiff's work and that Realty through its officers and managers had sole managerial control over Plaintiff during his employment.  Thus the second factor also weighs entirely against any finding of joint employer status for OLCC with respect to Plaintiff.

### 3.      Right to hire, fire, or modify working conditions

OLCC did not have the power to hire, fire, or modify Plaintiff's employment conditions. To the extent Don Harrill testified at deposition that he had such authority, he also testified as further supported by the official corporate records as to Realty's officers, that he was CEO of Realty at the time. That Harrill had authority to hire, fire or modify working conditions for Realty employees thus provides no basis for any claim that OLCC had such authority or was a joint employer of Realty's employees.   Likewise to the extent Plaintiff attempts to point to the involvement of human resources personnel in hiring and discipline issues, and in connection with the employment policies, of Realty, human resources personnel were employed by WRMC and not by OLCC.  Moreover human resources personnel provided an advisory or consulting role

only, and Realty's officers were the actual decisionmakers with respect to all such matters.  This third factor also does not support joint employer status of OLCC over Plaintiff.

### 4.    Power to determine rates or method of payment

"Method of payment refers to the basis upon which a worker is paid, for example, by the hour or by the piece."  *Antenor*, 88 F.3d at 936.  The undisputed facts supported by competent evidence shows that OLCC did not have the power to set pay rates or methods of payment of Plaintiff or other Realty employees.  In consequence the fourth factor does not support joint employer status for OLCC.

### 5.    Preparation of payroll and payment of wages

The undisputed evidence is that WRMC prepares the payroll checks for Realty's employees and is administratively responsible for the payment of wages to those employees. Yet Realty is listed as Plaintiff's employer on his Form W-2s, indicating his earnings were from Realty and not from WRMC or any other entity.  That WRMC prepares payroll and handles payment of wages as administrative support for Realty does not provide any basis for the contention of Plaintiff in his amended complaint that OLCC is a joint employer of Plaintiff, however, and instead this final factor weighs against joint employer status as well.

In sum the factors taken together weigh heavily against joint employer status under the FLSA on the undisputed facts.  In consequence, OLCC cannot be found to constitute a joint employer of Plaintiff, and the facts and law therefore require that summary judgment be granted for OLCC in this case.

**B.**      **In the alternative, if OLCC is Plaintiff's employer, Plaintiff is exempt from the FLSA's overtime requirements by the FLSA's section 7(i) exemption.**

If Plaintiff is nonetheless found to have been employed by OLCC, then Plaintiff's claim for overtime is defeated by the FLSA's 7(i) exemption, and summary judgment alternatively should be granted for OLCC on this basis.

Section 7(i) of the FLSA exempts from the FLSA's overtime requirements "any employee of a retail or service establishment ... if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 6 [the minimum wage section] of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. " 29 U.S.C. § 207(i).

To qualify for Section 7(i)'s exemption from the overtime provisions of the FLSA, three conditions must be met:

(1)      the employee must be employed by a "retail or service establishment" within the meaning of section 7(i);

(2)      the employee's regular rate of pay must exceed one and one-half times the applicable minimum wage; and

(3)      more than half the employee's total earnings in a representative period must consist of commissions on goods or services.

The second and third items are clearly satisfied here, and the application of the 7(i) exemption thus turns on whether OLCC constitutes a "retail or service establishment". For the reasons discussed below, the FLSA, applicable regulations, case law, and public policy all support a finding that OLCC fairly should be determined by the Court to constitute a "retail or service

-14-

establishment", and the section 7(i) exemption therefore applies to preclude Plaintiff's claim for overtime in this case.

### 1.      Plaintiff satisfies the compensation-based requirements of the FLSA's 7(i) exemption.

If an establishment qualifies as a retail or service establishment, then any employee employed by that establishment is exempt if the employee's compensation satisfies Section 7(i)'s two other requirements: compensation of one and one-half times the minimum wage and more than one-half derived from commissions on goods or services. *See* Conf. Rep. No. 87-327, 1961 U.S.C.C.A.N. 1706, at 1712-13 (May 2, 1961). *See also, e.g., Martin v. The Refrigeration School, Inc.*, 968 F.2d 3, 5 (9th Cir. 1992) (If an entity is a "retail or service establishment," Section 7(i) exempts all "employees whose regular rate of pay is 150 percent of the minimum hourly rate and who receive more than half their compensation by way of commissions."); Mechmet v. Four Seasons Hotel, Ltd., 825 F.2d 1173, 1174 (7th Cir. 1987) (The FLSA's overtime "provisions do not apply to employees of 'a retail or service establishment' if the employee's regular rate of pay is more than 1.5 times the minimum wage and if more than half his compensation for a representative period (not less than one month) represents commissions on goods or services."); and *Reich v. Cruises Only, Inc.*, No. 95-660-CIV-ORL-19, 1997 WL 1507504, at *6 (M.D. Fla. June 5, 1997) (Travel agency "is a retail or service establishment under 29 U.S.C. § 207(i) and thus is not subject to the [overtime] requirements of § 207(a).").

As a preliminary matter, the undisputed facts show that Plaintiff's regular rate of pay exceeded one and one-half times the applicable minimum wage – then $5.15 per hour – and that

-15-

more than half of Plaintiff's total earnings in a representative period consisted of commissions on sales of goods or services.

As the minimum wage during the time period at issue was $5.15 per hour, Plaintiff's regular rate of pay must exceed $7.73 per hour ($5.15 x 1.5) to meet the element of the exemption that his regular rate of pay was in excess of one and one-half times the minimum hourly rate applicable to him under 29 U.S.C. § 206.   Even accepting for purposes of this computation that Plaintiff – as asserted in his interrogatory responses to the Court -- regularly worked 60 hours a week, Plaintiff earned a total of $252,328 in earnings over 88 weeks, for an average of $47.79 per hour assuming 60 hours per week – well above the $7.73 hourly rate required.  *See Schwind v. EW & Associates, Inc.*, 371 F.Supp.2d 560, 568 n. 8 (S.D.N.Y. 2005) (calculating plaintiff's regular rate of pay for purposes of section 7(i) by averaging the commissions received by plaintiff in a year and allocating the average to each week, and then dividing that figure by a maximum number of hours that could have been worked).

In addition, Plaintiff cannot dispute that more than half of his pay represented commissions on goods or services.  Thus the sole issue is whether OLCC constitutes a "retail or services establishment".

### 2.        OLCC constitutes a "retail or service establishment".

Section 207(i) of the FLSA does not define "retail or service establishment", but section 213(a)(2) did, though now repealed.  However a number of courts, including this Court, that have considered the issue have found that although section 213(a)(2) was repealed, the definition of "retail or service establishment" contained in that section nonetheless still applies to section

207(i).²/  Section 213(a)(2) defines "retail or service establishment" as "an establishment 75

percentum of whose annual dollar volume of sales of goods or services (or of both) is not for

resale and is recognized as retail sales or services in the particular industry."  28 U.S.C. §

213(a)(2).

The DOL regulations articulate some of the characteristics and provide examples of retail

or services establishments in 29 C.F.R. § 779.318.  Specifically, the regulations provide that a

retail or service establishment: sells goods or services to the general public; serves the everyday

needs of the community in which it is located; and is at the very end of the stream of distribution

and disposes its products and skills in small quantities while not taking part in the manufacturing

process.  29 C.F.R. § 779.318(a).

The regulations also provide "partial lists" of establishments lacking and possessing the

retail concept.  29 C.F.R. § 779.317, 779.320.  However those categories haven not been

uniformly accepted by courts.  *See e.g., Martin v. Refrigeration School, Inc.,* 968 F.2d at 7

(finding no rational basis for the DOL's categorizing all schools as non-retail except those

---

²/The Eleventh Circuit has not addressed the issue of whether the definition formerly
found in § 213(a)(2), and the regulations and case law built upon it, should continue to be
applied in determining what qualifies as a "retail or service establishment" under § 207(i)'s
exemption.  Several other courts of appeal have continued to apply former § 213(a)(2)'s
definition, however, *see Reich v. Delcorp,* 3 F.3d 1181,1183 (8ᵗʰ Cir. 1993) and *Gieg v. DDR,*
407 F.3d 1038, 1047 (9ᵗʰ Cir. 2005), as well as a number of district courts including this Court.
*See, e.g., Schwind,* 371 F.Supp.2d at 564; *Barnett v. Washington Mutual Bank, F.A.,* 2004 WL
1753400 at *2 (N.D.Cal. Aug. 5, 2004); *Collins v. Horizon Training Ctrs., L.P.,* 2003 WL
22388448 at *3 n. 1 (N.D.Tex. Sept. 30, 2003); *Bennett v. SLT/TAG Inc.,* 2003 WL 23531402
at *5 (D.Or. May 8, 2003);  *Casas v. Conseco Fin. Corp.,*2002 WL 507059 at *3-5 (D.Minn.
March 31, 2002) ; *Reich v. Cruises Only, Inc.,* 1997 WL 1507504 at *2 (M.D.Fla. June 5, 1997).

serving handicapped or gifted students);  *Cruises Only, Inc.,* 1997 WL 1507504 at *2 (finding

arbitrary and irrational DOL's listing of travel agencies as lacking a retail concept). The DOL's

regulations list real estate companies as lacking a "retail concept", but state that those that may

be recognized as retail include: auto courts, bowling alleys, cemeteries, clothing stores, hotels,

recreational camps, restaurants, tourist homes, theaters and trailer camps.  The sale of timeshare

vacations are not mentioned in either "partial list".

In *Cruises only*, the Court found that the establishment at issue - a cruises-only travel

agency – "meets all of the requirements for a service establishment described above [in 29 CFR

779.319].

> Cruises Only sells its services to the general public. Cruises Only also serves the
> everyday needs of the community. Although Reich is correct in his argument that
> vacations are not an everyday occurrence and are the exception, not the rule, regarding
> the needs of the community on a daily basis, the Court finds that this is not necessarily
> determinative. The regulation stating that a retail or service establishment must serve the
> everyday needs of the community should not be interpreted to mean that such
> establishment must be used by everyone in the community on a daily basis. ...With ever
> increasing options for travel, travel agencies have become much more commonplace and
> more of a necessity for conveniently making travel plans in the daily lives of the public.
> Travel agencies have become a common and convenient method of organizing an entire
> travel package at one location.

*Id*. at *3 (footnote omitted).  The rationale the court applied to vacation packages in *Cruises*

*Only* directly apply and suggest that the timeshare vacation packages at issue in this case also

satisfy the retail concept necessary for the exemption to apply.

First, it is undisputed that OLCC's product is sold to the general public, satisfying the

first component.  In addition, OLCC meets the second component because the regulation cannot

be interpreted to mean that a consumer must use the establishment every day, as discueed in

*Cruises Only*; nonetheless the timeshare vacation product has become much more common place and constitutes a convenient method for obtaining a complete vacation package at one location. In *Cruises Only*, the plaintiff – DOL - argued that the cruise taken by the passenger was at the end of the stream of distribution and not the service provided by Cruises Only when it made the reservations for the customer and gave the passenger the ticket; here the vacation taken by the consumer is the very product sold.   As in *Cruises Only*, that OLCC's product is not purchased for immediate resale also indicates that the services are at the end of the stream of distribution.

Although the definition of "retail or service establishment" in § 213(a)(2) requires that the business' goods or services be "recognized as retail sales or services in [its] particular industry", the Supreme Court has made clear in *Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 204-05 (1966), that the meaning of "retail" is to be determined by the courts, not by the defendant or the defendant's industry. Unlike in *Cruises Only*, where the regulation listed travel agency services as not retail and where three Wage and Hour Opinion letters existed that stated travel agencies had no retail concept, neither the regulation nor any opinion letter from the DOL address whether timeshare vacation resorts have a retail concept.  Where auto courts, hotels, and tourist homes have explicitly been recognized by the Secretary as retail, *see* 29 C.F.R. § 779.320, timeshare vacation resorts surely should be as well, particular where, as here, the timeshare vacation resort is licensed as a public lodging establishment by the state of Florida and held out as such to the general public according to the provisions of Chapter 509, Fla. Stat.

3.      **Application of the 7(i) exemption to Plaintiff is consistent with the legislative history and purpose of that exemption.**

Finally, the legislative purpose and policy considerations of the FLSA also support a conclusion that Plaintiff is not entitled to overtime compensation if he is found to be an employee of OLCC.  In *Mechmet,* 825 F.2d at 1177, the Seventh Circuit observed that overtime statutes were designed to protect "marginal, non-unionized workers," and that § 207(i) was designed to exempt commissioned employees of a "big-ticket department."[3/]  As this Court likewise stated in *Cruises Only*:

> The purposes of the [minimum wage] law are to prevent workers willing to work abnormally long hours from taking jobs away from workers who prefer to work shorter hours, to spread work and thus reduce unemployment by requiring employers to pay a penalty for using fewer workers to do the same amount of work, and to protect overtime workers from the dangers which a long work week may entail....the workers in this case are not those for whom the overtime provisions were designed. The evidence in this case is unrefuted that employees of Cruises Only make more than one and one-half times the minimum wage for each hour worked, and some salespeople (though this is probably not

---

[3/]The court's observations about the difficulties of requiring overtime pay for such "big-ticket" commissioned employees apply directly to Plaintiff's situation:

> It would not be easy for the employer to cope with the irregular conditions of the salesman's job by placing a 40-hour ceiling on each salesman's weekly work and then hiring additional salesmen to take up the slack.  If instead the employer paid the salesman time and a half for overtime during the busy weeks, this would just amplify the weekly fluctuations in the salesman's earnings, especially since, in the long run, either the base pay (if above the minimum wage), or the commission rate, or both, would decline, to offset the overtime premium.

*Id.* at 1176-77;  *see also Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 307 (7th Cir.1986) (stating that "[c]ommission salesm[e]n have fluctuating hours and income, and it is unlikely that Congress meant to require employers to pay overtime in the lean weeks when the fat weeks more than make up.").

the rule) have made as much as $60,000 in one year. These employees are involved in big-ticket sales which § 207(i) was intended to exempt.

*Cruises Only* at *6 (internal citations omitted).

In the circumstances here, Plaintiff's earnings also fluctuated considerably from pay period to pay period. For example, he received $10,383.15 during the pay period ending April 23, 2006, but only $929.20 during the pay period ending one month later, May 21, 2006. *See* DE 25. More importantly, even assuming that Plaintiff worked 20 hours of overtime a week as he claims, Plaintiff was paid an average of at least $47 per hour, for a total of $252,328 in just over 20 months of work. He was thus an employee involved in the "big-ticket" sales which § 207(i) was intended to exempt.

That timeshare vacation salespeople are not those for whom the overtime provisions were intended to protect and instead that such individuals properly come within the 7(i) exemption is consistent with Plaintiff's failure to assert a claim against his current employer, Sheraton Vistana, even though he is not being paid overtime and is being paid purely on commissions at his new job as he was at Orange Lake. That Plaintiff has asserted no claim against his current employer when employed in the same position, selling the same product, and receiving the same method of compensation, suggests Plaintiff acknowledges that the position is properly exempt from overtime according to the purposes behind the exemption.

## IV.   CONCLUSION.

For all the above-stated reasons, OLCC respectfully requests that summary judgment be granted in its favor and that Plaintiff's claims be denied in their entirety.

-21-

Dated: November 28, 2007.

Respectfully submitted,

STEARNS WEAVER MILLER
  WEISSLER ALHADEFF & SITTERSON, P.A.
Attorneys for OLCC
Suite 2200, Museum Tower
150 West Flagler Street
Miami, Florida 33130
Telephone No.: (305) 789-3200
Facsimile No.:  (305) 789-3395


By:     s/Joan M. Canny             
      ROBERT S. TURK
      Florida Bar No.: 261343
      rturk@swmwas.com
      JOAN M. CANNY, ESQUIRE
      Florida Bar No. 0492531
      jcanny@swmwas.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 28, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to Attorney for Plaintiff, K. E. Pantas, Esquire, Pantas Law Firm, P.A., 250 N. Orange Avenue, Eleventh Floor, Orlando, Florida 32801.

s/Joan M. Canny

G:\W-LIT\36929\027\Drafts\OLCCMotion for Summary Judgment.wpd